UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| FELICIA BARTLETT,<br><br>                      Plaintiff,<br>-against-<br><br>LOUIS DEJOY,<br>POSTMASTER GENERAL,<br><br>                      Defendant. | Case No.  22-CV-3398<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Felicia Bartlett by her attorneys, Crumiller P.C., as and for her complaint against Louis DeJoy, Postmaster General for the United States Postal Service, alleges as follows:

## PRELIMINARY STATEMENT

1. Bartlett is a young woman who suffers from anxiety and Post-Traumatic Stress Disorder (PTSD), stemming from a violent attack she experienced late at night close to home, when a strange man tried to grab her and chased after her.

2. In November 2020, Bartlett secured a job working for USPS.[1] Several months after she started, USPS changed Plaintiff's schedule from the day shift to an overnight shift, unilaterally and without warning. This required Bartlett to walk home alone at 3:00 a.m., in her dangerous neighborhood, and relive her traumatic assault night after night.

3. Bartlett sought desperately to switch back to the daytime shift, explaining her PTSD and the attack to her supervisors, but her requests were denied without explanation. Instead, she was told to "learn to defend herself or resign." Bartlett could not afford to quit her job, and was forced to work the overnight shift.

---

[1] Bartlett brings this action against USPS, represented by Louis DeJoy, Postmaster General for the United States Postal Service ("USPS" or "Defendant").

1

4.      On the overnight shift, the male supervisory staff relentlessly sexually harassed Bartlett. They openly made bets on who would "fuck" her and the other "new bitches" first. Bartlett wanted to complain, but there was no one – other than the supervisors harassing her – to complain to.

5.      Between the unremitting sexual harassment, and her commute home triggering her PTSD each night, Bartlett developed such severe anxiety that she began having fainting spells, including one occasion when she fainted at work as she saw one of her harassers approaching her. Bartlett felt especially vulnerable losing control over her body while surrounded by sexually menacing coworkers. At work, Bartlett's chest often felt like a hot air balloon, and she experienced heart palpitations, rapid breathing, and dizziness.

6.      Bartlett's doctor told her that her symptoms were being caused by her stress, and she had to find a way to ameliorate her situation, or else her mental and physical health would continue to deteriorate, with potentially permanent effects on her heart.

7.      Plaintiff formally reported the sexual harassment and disregard of her PTSD to a USPS manager. USPS flatly refused to do anything in response. Bartlett had no choice but to resign her position.

8.      USPS discriminated against Bartlett on the basis of sex, in that she suffered a hostile work environment and then constructive discharge, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq* ("Title VII"). USPS also violated the Americans with Disabilities Act of 1990, § 2 *et seq.*, 42 U.S.C.A. § 12101 *et seq.*, as amended by § 504 of the Rehabilitation Act of 1973 ("ADA"), by failing and refusing to grant her a reasonable accommodation or even to engage in an interactive dialogue with her about her request.

## PARTIES

9.      Plaintiff is a woman who is domiciled in Far Rockaway, New York. She was employed by Defendant from November 16, 2020, until her constructive discharge on April 11, 2021.

10. Defendant Louis DeJoy is the Postmaster General for the USPS, which is an independent agency under the executive branch of the United States federal government responsible for providing postal service in the United States. The USPS is headquartered in Washington, D.C. with offices in New York.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over Bartlett's claims pursuant to 28 U.S.C. § 1343, as Plaintiff has asserted claims that arise under federal laws of the United States.

12. Venue is proper in the Eastern District of New York pursuant to 29 U.S.C. § 1391(b)(2) because Plaintiff resides in this District and a substantial part of the events or omissions on which the claims asserted herein occurred in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

13. On April 10, 2020, Bartlett filled out the two-page Form 2527 and handed it to USPS. Bartlett explained that she was tendering her resignation because she felt she had no other choice.

14. On July 28, 2021 via United States Postal Service Priority Mail, Bartlett received the notice to file a formal complaint from the Equal Employment Opportunity ("EEO") Alternate Dispute Resolution office.

15. On August 2, 2021, Plaintiff filed her EEO Complaint with the USPS EEO office.

16. On March 14, 2022, Plaintiff received USPS EEO office's final decision and Plaintiff's right to sue letter.

## FACTUAL ALLEGATIONS

17. Bartlett is a 34-year-old woman who lives alone in Far Rockaway, New York.

18. From 2016 through 2019, Bartlett worked at J&D Pharmacy delivering medication to patients around Long Island and Queens. While on the job, a truck ran a stop sign and smashed into

3

her car, sending her car ricocheting into a pole. Bartlett was rushed to the hospital and had emergency surgery on her knee.

19. For two years, Bartlett was unemployed as she recovered from her injuries.

20. By 2020, Bartlett was finally healthy enough to begin working again. Unfortunately, J&D Pharmacy had replaced her, and she had to find a new position to financially support herself.

21. Bartlett took work wherever she could find it, including working in an Amazon warehouse during the height of the COVID-19 epidemic.

22. She also found a position delivering automobile parts for a local auto shop, although the pay was barely above minimum wage and she had to use her own car to make deliveries.

23. In 2020, Bartlett and her husband separated. She was alone and had no other financial support, and was in serious need of a stable, predictable job.

24. In September 2020, following a lengthy application process, USPS offered Bartlett a temporary position in its Bethpage location. She was told that if she performed well, after a few months she would be converted to a permanent employee.

25. Bartlett was thrilled; USPS was precisely the type of long-term employment opportunity she was hoping for. Her hourly wage was higher than what she had been making, she was eligible for union membership, had health benefits, and long-term savings options like a 401K. She immediately accepted the offer.

26. On November 16, 2020, Bartlett began working for USPS as a Clerk in the Bethpage, NY facility.

27. As a Clerk, Bartlett worked with approximately 250 people in a USPS warehouse, taking mail off a conveyor belt and sorting it into mailboxes for delivery.

28. The warehouse was organized in sections based on mail sorting location, Bartlett worked in a section with about 22 other workers, which was split about evenly between men and women.

29. Bartlett got along well with her coworkers and supervisors, and quickly became friends with many of them. She was known as friendly, hardworking, and focused.

***Bartlett's Attack and Her PTSD***

30. On January 5, 2021, at around 12:30 a.m., Bartlett driving home. When she arrived, she parked her car as close to her apartment as she could, about two blocks away.

31. Far Rockaway has a high crime rate, and numerous violent crimes have taken place near her apartment. Bartlett's home is in between two public parks, which have been a hotbed for crime in the recent months. Bartlett is aware of one woman who was raped extremely close to her home, as well as multiple incidents involving gun violence in the same immediate vicinity.

32. As Bartlett was walking home along the poorly lit streets, she suddenly felt the bottom of her coat tighten and pull away from her. She turned around, terrified, and saw a man trying to grab her from behind.

33. Bartlett began running as fast as fast as she could. The man ran after her, close behind, yelling "get over here."

34. Thankfully, Bartlett lost him after a couple of blocks. She managed to make it to her apartment and slammed and locked the door behind her.

35. Bartlett was terrified. She felt unsafe and trapped in her home, afraid of what might happen to her if she stepped outside.

36. Bartlett reported the incident to the police, but her assailant was never identified. As far as she knows, he remains at large to this day.

37. Bartlett developed PTSD as a result of the attack. She avoided walking around her neighborhood after sunset, and stopped leaving her home after dark.

*Defendant Unlawfully Denies Bartlett a Reasonable Accommodation Without Engaging in an Interactive Process*

38. In February 2021, Bartlett was on her lunch break when her supervisor, Andrea, walked over and handed her a letter. The letter informed Bartlett that she was being moved from the daytime shift to an overnight shift, which was from 6:00 p.m. – 2:30 a.m., effective mid-March 2021.

39. Bartlett immediately got up to go speak with Andrea. She told her about the attack, the extreme anxiety she experienced when walking near her apartment at night, and how the shift change would be seriously detrimental to her physical and mental health.

40. Andrea appeared sympathetic, but told Bartlett that if she wanted to stay on the day shift, she needed to bring "some type of documentation." Andrea did not explain what type of documentation would suffice.

41. Bartlett immediately contacted an attorney, Benjamin Pinczewski, who she spoke with after work in or around the same day. Pinczewski wrote a letter to USPS, describing Bartlett's medical condition, and asking USPS to provide Bartlett a reasonable accommodation by allowing her to stay on the dayshift.

42. The next day, Andrea was not available, so Bartlett handed the letter to Andrea's supervisor, Ralph Guadagno, Manager of Distribution Operations ("MDO"). Guadagno told Bartlett that he would give the letter to USPS's attorneys.

43. Day after day went by, and Bartlett heard nothing about her request for a reasonable accommodation. Her anxiety worsened each day as her shift change approached.

44. With only a few days until her new shift time was scheduled to start, Bartlett began asking other USPS managers about her request for the reasonable accommodation.

45. Bartlett asked Gary Jean-Philippe, who ordinarily supervised the night shift but happened to be supervising Bartlett one day that week, whether he was aware of her request and if there was anything he could do. Jean-Phillipe told Bartlett that because she had given Guadagno the request, there was nothing he could do.

46. Bartlett also approached Sharon King, who was a Union Representative, as well as Eun Kim, the Union President, and even emailed Kim the letter. Neither provided any assistance.

47. Bartlett then followed up with Andrea to ask if she could avoid or at least delay the shift change. Andrea told Bartlett that she had escalated the request to Guadagno, but Guadagno had denied it, without explanation.

48. Bartlett was distraught. She suffered intense fear and dread of having to commute home from work and walk from her car to her apartment at 2:30 a.m., retriggering the stress of her attack.

49. She began reaching out to more USPS employees, including Robert Peters, who is the Plant Manager, and to whom Guadagno reports. Bartlett explained and again relived her experience as a victim of assault and her PTSD and anxiety connected with commuting home during late-night hours. She pleaded with Peters to adjust her schedule and return her to a daytime shift as a reasonable accommodation for her mental health condition.

50. Bartlett again followed up with Guadagno directly. This time, Guadagno told Bartlett that even if he wanted to, he could not grant her request, which needed to be handled by USPS's attorneys. Guadagno told Bartlett that he had forwarded the request to the appropriate attorneys at USPS, and she just had to wait for their response.

51. The day before her schedule was set to switch, Bartlett approached Peters while at work and again asked if she could stay for the day shift while she waited for USPS's attorneys to respond.

Peters told Bartlett that her shift would not be switched, and that she could either "learn to defend [her]self or resign."[2]

52. Bartlett was not familiar with any Human Resources personnel or anyone else who could help her. Nor had any of the many individuals she approached directed her to any HR representative.

53. To be clear, nobody she approached, including Andrea, Peters, King, Kim, or Guadagno, ever responded to the letter from Bartlett's attorney requesting a reasonable accommodation. She was not given any guidance or instruction on any further steps or documentation she should provide. Had USPS asked, Bartlett would have gladly provided documentation substantiating her condition and the necessity of the accommodation. Instead, USPS failed to engage in any interactive dialogue or make any attempt to accommodate Bartlett medical condition.

***Bartlett Experiences Extreme Emotional Distress Following Her Shift Change***

54. Bartlett was desperately afraid of losing her new job and benefits. In mid-March, she began working the overnight shift.

55. Each night, Bartlett was afraid and dreaded her commute. She began a routine of calling a friend after she parked but before getting of the car. She then ran the one to two blocks home to her apartment and only hung up the phone once safely inside.

56. Bartlett also purchased mace, and clutched it in her other hand while she ran home.

57. Each night when Bartlett got home from work, she shook and her heart raced, as she relived the night she was attacked over and over again.

---

[2] Upon information and belief, USPS never told any male employees that they simply need to "defend" themselves in a dangerous environment or resign.

*Defendant Subjects Bartlett to An Onslaught of Sexual Harassment*

58. On the night shift, Bartlett was assigned almost all new supervisors, and had almost all new coworkers.

59. While nearly all overnight clerks at this USPS facility were female, Bartlett noticed that virtually all individuals at the supervisory and/or management level on the overnight shift were male. Bartlett had several supervisors, almost all of whom were male. This was a very different gender breakdown from the daytime shift, which was more evenly split between men and women.

60. There was one supervisor, Anthony Wilson, who she knew from the day shift. Soon after the shift change, Bartlett was chatting with Wilson one night. Wilson warned Bartlett that the male overnight employees had been gossiping about her and her "friend with the big butt" (referring to Bartlett's female coworker, Shawna Davis), saying they were "happy" that Bartlett and Davis had been transferred.

61. Wilson did not explain why the men were so "happy" or tell Bartlett anything else; Bartlett suspected that the male employees had been talking about her and Davis because they were women and because the male supervisors intended to prey on their female subordinates.

62. One of Bartlett's new coworkers was a man named Vaughn McCall. McCall was a younger man in his 20s, over six feet tall and with an athletic build. McCall worked in a separate part of the warehouse and had worked for USPS for quite some time, and appeared friendly with Bartlett's supervisors.

63. On March 20, 2021, only a few days into her new shift, Bartlett was working at her sorting station and was on a call with Wilson when McCall approached her. Bartlett was confused and surprised, as he had no reason to be by the sorting station. McCall interrupted Bartlett's call to ask her if she would like to "see the game room."

9

64. Confused, Bartlett asked McCall, "you guys have a game room?" McCall replied that the "game room" was where "we fuck the new bitches."

65. McCall went on to explain that there are bets between the USPS male employees as to who will "fuck" the "new girl first."

66. Bartlett felt absolutely mortified and disgusted; all she could think was that she immediately wanted to get as far away from McCall as possible. She stood up and walked away, still holding the phone with Wilson on the line.

67. Bartlett immediately asked Wilson if he heard McCall; Wilson confirmed that he had.

68. Bartlett complained to Wilson on that call that McCall's statements were harassing and inappropriate. She expected Wilson, as a supervisor, having heard the remarks with his own ears, would take some sort of appropriate action. However, upon information and belief, Wilson did nothing to address Bartlett's complaint.

69. Thankfully, McCall did not work near Bartlett's workstation, and she was able to avoid him after that.

70. After Wilson's and McCall's remarks, Bartlett endeavored to keep to herself. Feeling fearful and objectified, she tried to avoid interacting with any of her male coworkers.

71. A few days later, Jean-Philippe approached Bartlett while she was working. He told her that her pants were a "distraction" to the other employees and that everyone was looking at her "ass cheeks."[3]

72. Jean-Philippe instructed Bartlett to leave her workstation and walk to his office, and gave her a different assignment so that she could work in isolation for the remainder of her shift.

---

[3] Bartlett wore the same black leggings that all the other women in the facility wore, which were work-appropriate and fully opaque.

10

73. Bartlett was deeply humiliated and revolted by the thought that her male coworkers were sexually fixating on her body.

74. On March 17, 2021, Bartlett saw that McCall (who had talked about "fuck[ing] the new bitches") had found her personal Instagram account. He replied to a picture she had posted of herself watching TV, writing "[W]here the pool & jacuzzi at" with an emoji of a pair of eyes. Bartlett was mortified that McCall was messaging her and trying to spend time with her outside of work. She felt extraordinarily violated by this intrusion into her personal life and space. She did not respond to his message, and felt disgusted that McCall was apparently thinking and fantasizing about her.

***Bartlett Experiences Debilitating Emotional Distress; is Constructively Discharged***

75. Bartlett, who was already spending each day dreading her evening commute, running home from her car, and arriving home heart racing in the middle of the night, was now consumed with dread that any man at her workplace might be ogling her, talk about "fucking" her, or otherwise sexualizing her.

76. Bartlett retreated into herself. She evaded eye contact with her male coworkers and avoided interacting or speaking with her coworkers. The thought of having a sexually harassing interaction with a male coworker was so overwhelming that she sometimes began to panic.

77. On one occasion, while Bartlett was removing mail from the conveyer belt in the back loading area, Bartlett saw McCall walking towards her. She was so petrified she suddenly became lightheaded. Before she knew it, Bartlett fainted. She stumbled and fell to the floor next to the complex metal conveyer belt.

78. When she regained consciousness, Bartlett was scared and shocked. She had never fainted before; she was horrified that she had lost complete control over her body.

79.     Had Bartlett fainted closer to the conveyer belt, she could have gotten caught in the perpetually rotating pulleys that operate the belt, and could have been very seriously injured.

80.     McCall approached her, and simply remarked that she didn't seem to be doing too well. He instructed her to follow him, and she picked herself up. Still bleary eyed, she followed him to a private office.

81.     McCall instructed Bartlett to clock out and go home, and then left her in the office. She was not paid for the remainder of the day.

82.     Bartlett's anxiety, heart racing, and fainting intensified. She had to call out sick several times over the next two weeks.

83.     Bartlett assumed there was some underlying physical cause to her recurring fainting spells and anxiety. She underwent extensive medical testing in an effort to diagnose her condition, including numerous rounds of bloodwork and an electrocardiogram, but there was no discernable physical cause for Bartlett's symptoms.

84.     On or around March 22, 2021, Bartlett told her physician, Dr. Manpreet Singh, about the sexual harassment, the commute and her PTSD, and the stress she was experiencing. Dr. Singh advised Bartlett that after ruling out any other potential causes, her fainting spells appeared to be a symptom of her work-related stress.

85.     Dr. Singh also explained that the work-related stress and anxiety were so dangerous and detrimental to her health that remaining in such conditions could have not just short-term but also long-term, permanent damage to her heart.

86.     Bartlett felt helpless. She wanted to keep her job and sole source of income, but knew she could not risk her long-term health.

87.     On April 10, 2021, with no other option, Bartlett went to work and spoke to the supervisor on staff, Elyssa Joseph.

88. Bartlett told Joseph how USPS had failed to provide her a reasonable accommodation, and how her PTSD and anxiety have manifested at work. She described how McCall told her that he and the other male supervisors wanted to "fuck her" at work, and how the male employees were distracted by her "butt cheeks."

89. Joseph looked surprised. She told Bartlett that McCall was her boyfriend. Though she had no way of knowing, she simply denied McCall had ever made the "game room" comments.

90. Bartlett took out her phone and showed Joseph the Instagram message McCall had sent. Joseph merely shrugged her shoulders and told Bartlett to block McCall on Instagram.

91. After that, Joseph handed Bartlett a two-page resignation form, labeled Form 2527, to fill out by hand.

92. Bartlett filled out the form right there in front of Joseph, including a lengthy description of USPS's mistreatment of her, its failure to provide her a reasonable accommodation, the sexual harassment she experienced, and the emotional distress she had suffered from as a result.

93. When Bartlett finished filling out the form, Joseph reviewed and signed it, acknowledging Bartlett's resignation. Joseph kept the form and did not give Bartlett a copy.

94. Upon information and belief, no actions whatsoever were taken as a result of Bartlett's complaint: McCall was not disciplined for saying he wanted to "fuck the new bitches," Jean-Phillips was not disciplined for telling Bartlett her "ass cheeks" were distracting, and no investigation was done into whether the male employees as a group were openly sexualizing the female employees. Bartlett was not offered to switch her shift back to the day shift. Any of those actions could have enabled Bartlett to keep her job.

*USPS Refuses to Conduct an Adequate Investigation into Bartlett's Complaint of Discrimination and Retaliation*

95. USPS's discrimination complaint procedure required Bartlett to file an internal complaint and give the agency an opportunity to investigate her claims before she could bring this lawsuit.

96. Accordingly, on April 20, 2021, through counsel, Bartlett filed the requisite formal complaint, outlining USPS's unlawful failure to provide Bartlett with a reasonable accommodation, and sexual harassment, and constructive discharge.

97. On September 9, 2021, USPS sent Bartlett a form demanding she answer 112 detailed questions in writing, which she did.

98. On November 4, 2021, over six months after her formal complaint had been filed, USPS responded:

> a review of the record evidence after your complaint for investigation disclosed you <u>did not sign and date</u> PS Form 2575, "Resignation/Transfer from the Postal Service." There is nothing in the evidence obtained to date confirming you submitted a fully-executed resignation form to the US Postal Service…. said resignation form did not comply with the requirements … therefore, [this claim] is dismissed…

(emphasis in the original).

99. USPS claimed that one page of Bartlett's two-page April 10, 2021 resignation form was missing, and that it was therefore excused from its obligation to investigate the disability discrimination, sexual harassment, and hostile work environment in full.

100. Bartlett immediately appealed the decision. She provided an affidavit explaining that she had completed and submitted both pages of Form 2527, and that Joseph had not given her a copy of the form. She asked USPS to search for it and confirmed what she wrote when she completed the form.

101. On December 10, 2021, USPS sent a one-page letter stating that USPS "determined that the agency acted appropriately" and that Bartlett did not have the right to further appeal the decision.

102. USPS also refused to investigate Bartlett's complaint that USPS failed to engage in the interactive process and refused to offer her a reasonable accommodation due to her disability without justification.

**FIRST CAUSE OF ACTION:**
**Discrimination in Violation of Title VII**

103. Bartlett repeats and realleges each allegation set forth above.

104. Defendant unlawfully discriminated against Bartlett in the terms and condition of her employment by creating and subjecting her to a hostile work environment and constructively discharging her employment, on the basis of her gender and/or sex, in violation of Title VII.

105. As a result, Bartlett has suffered emotional distress and has incurred economic damages, attorney's fees, and costs.

106. Defendant willfully engaged in discriminatory practices with malice and/or reckless indifference to Bartlett's federally protected rights.

107. Bartlett is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

**SECOND CAUSE OF ACTION:**
**Retaliation in Violation of Title VII**

108. Bartlett repeats and realleges each allegation set forth above.

109. Defendant unlawfully retaliated against Bartlett for her protected complaints by creating and subjecting her to a hostile work environment and constructively discharging her employment in violation of Title VII.

110. As a result, Bartlett has suffered emotional distress and has incurred economic damages, attorney's fees, and costs.

111. Defendant willfully engaged in discriminatory practices with malice and/or reckless indifference to Bartlett's federally protected rights.

112.	Bartlett is entitled to an award of emotional distress damages, economic damages, punitive damages, attorney's fees, interest, and costs.

### THIRD CAUSE OF ACTION:
### Discrimination in Violation of the ADA

113.	Bartlett repeats and realleges each allegation set forth above.

114.	At all relevant times, Bartlett was a qualified person with a disability, or perceived as a person with a disability, who could perform the essential functions of her job with or without reasonable accommodations.

115.	Defendant was aware of Bartlett's disability and/or perceived Bartlett suffered from a disability, including but not limited to anxiety, PTSD, and fainting spells, all of which are disabilities as defined within the ADA.

116.	Defendant discriminated against Bartlett in the terms and conditions of her employment by failing and refusing to offer her a schedule change available to non-disabled individuals in violation of the ADA.

117.	Defendant knew that Bartlett was disabled and in need of reasonable accommodations, yet failed to engage her in an interactive process in order to identify effective reasonable accommodations, including, but not limited to a change in shift schedule, in violation of the ADA.

118.	Defendant discriminated against Bartlett on the basis of her disability and/or perceived disability by creating and subjecting her to a hostile work environment and constructively discharging her employment, in violation of the ADA.

### FOURTH CAUSE OF ACTION:
### Retaliation in Violation of the ADA

119.	Bartlett repeats and realleges each allegation set forth above.

120. USPS retaliated against Bartlett by failing to engage in the interactive process to offer her a shift change, creating and subjecting Bartlett to a hostile work environment, and constructively discharging her employment, in violation of the ADA.

121. As a result, Bartlett has suffered emotional distress and economic damages, and has incurred attorney's fees and costs.

122. Defendant acted with malice and/or reckless indifference to Bartlett's rights, and was aware that it was or may be acting in violation of federal law, entitling Bartlett to an award of punitive damages.

123. Bartlett is entitled to an award of emotional distress damages, economic damages, attorney's fees, costs, and punitive damages.

## DEMAND FOR RELIEF

WHEREFORE, Bartlett respectfully requests that this Court enter judgment in her favor:

a) Declares that the discriminatory actions, practices, and policies of Defendant as set forth above violated Title VII and the ADA;

b) Declares that the retaliatory actions, practices and policies of Defendant as set forth above violated Title VII and the ADA;

c) awards monetary damages to Plaintiff to compensate her for the discrimination she experienced, including economic damages, and damages for emotional distress;

d) awards Plaintiff punitive damages pursuant to Title VII;

e) awards Plaintiff reasonable attorney's fees and costs; and

f) grants such other relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to FRCP § 38(b), Plaintiff demands a trial by jury.

Dated: Brooklyn, New York
June 9, 2022

                                       Respectfully submitted,

                                       _____
                                       Hilary J. Orzick
                                       Susan K. Crumiller
                                       Crumiller P.C.
                                       16 Court St, Ste 2500
                                       Brooklyn, NY 11241
                                       (212) 390-8480
                                       hilary@crumiller.com
                                       susan@crumiller.com
                                       Attorneys for Plaintiff